1

THE LAW OFFICES OF
**ABDULAZIZ, GROSSBART & RUDMAN**
6454 Coldwater Canyon Ave.
North Hollywood, CA 91606-1187
(818) 760-2000 or Fax (818) 760-3908
Bruce D. Rudman (SB# 184610)
email address: bdr@agrlaw.com

2

3

4

5

*Proposed* Attorneys for the Debtor, 901 STRADA LLC

6

M. Jonathan Hayes (Bar No. 90388)
Matthew D. Resnik (Bar No. 182562)
**RESNIK HAYES MORADI LLP**
17609 Ventura Blvd., Suite 314
Encino, CA 91316
**Telephone:** (818) 285-0100
jhayes@rhmfirm.com

7

8

9

10

11

*Proposed* Special Counsel for Debtor
901 Strada, LLC

12

13

14

UNITED STATES BANKRUPTCY COURT

15

CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

16

17

| In re | Case No.: 2:19-bk-23962-BB |

18

901 STRADA, LLC,

Chapter 11

19

Debtor.

**CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY; DECLARATIONS OF MOHAMED HADID, JUSTIN KUNKLE AND CARL JOSEPHSON IN SUPPORT THEREOF**

20

21

22

23

24

Action Filed:     November 27, 2019

25

Date:  December 17, 2019
Time: 10:00 a.m.
Place: Courtroom 1539
        255 E. Temple Street
        Los Angeles, CA 90012

26

27

28

1     **TO THE HONORABLE SHERI BLUEBOND, UNITED STATES**

2 **BANKRUPTCY JUDGE; TO THE OFFICE OF THE UNITED STATES TRUSTEE;**

3 **AND ALL CREDITORS AND PARTIES IN INTEREST:**

4

5     **COMES NOW,** the Debtor, 901 STRADA, LLC, who files this Opposition to the

6 Motion to Dismiss Bankruptcy Case, and the separate Motion for Relief from Automatic Stay

7 (with some exceptions).

8     At the outset, the moving parties have provided the Court with a substantial amount of

9 hearsay, hyperbole, and argument, all without foundation. Indeed, by offering one or two page

10 snippets of long depositions, the movants portray the case much differently from reality. By

11 this filing, just over two weeks removed from the filing of its Petition, the Debtor focuses on

12 its reasons for filing for bankruptcy, its goals through bankruptcy, and the reasons why the

13 Debtor's creditors, and even the movants, Plaintiffs in a State Court case, will be better off if

14 the Debtor can accomplish its goals. Otherwise, the real property at issue will continue to be a

15 blight on the community for years to come.

16     Most importantly, there is no exigency for the case being dismissed or remanded to the

17 State Court receiver. Indeed, even the receiver has indicated nothing will (or can) happen for

18 months. Meanwhile, the Debtor, its primary secured creditor, and outside third-parties, are

19 working on the details to resolve the issues with the property, which would even satisfy the

20 movants – at least as to the real property issues.

21     As the movants' state, this is not the typical bankruptcy case. That is probably the only

22 thing that is agreed upon by the Debtor. The bankruptcy was not filed in bad faith. It was not

23 filed to take the case away from Judge Karlan or to otherwise judge-shop. It was filed to

24 avoid the appointment of a receiver, whose charge was to take control and demolish the

25 property, striping its value from the Debtor and the creditors. Filing a bankruptcy to avoid the

26 appointment of a receiver and any new borrowing by that receiver is not bad faith – filing

27 bankruptcy is intended to take any rights to possession away from the receiver, to be instead

28 immediately assigned to the bankruptcy court. _Taylor v. Sternberg_, 293 U.S. 470, 472, 55 S.

ABDULAZIZ, GROSSBART & RUDMAN
Law Offices Of
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

1    Ct. 260, 262, 79 L. Ed. 599 (1935).

2          And to be clear, the Debtor disputes that the civil court properly appointed a receiver;

3    *with the receiver and the civil court in agreement that no actual demolition will occur for at*

4    *least four to six months, there clearly are no exigent circumstances why this Motion should*

5    *be heard on shortened notice.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................................V

**MEMORANDUM OF POINTS AND AUTHORITIES** ..................................1

**I.    THE CHAPTER 11 FILING WAS NOT FILED IN FAITH AND THE CASE SHOULD NOT BE DISMISSED** ............................................................1

**II.    BACKGROUND RELEVANT TO THE COURT'S DETERMINATION** ................3

A.  THE DEBTOR: ...........................................................................................3
B.  THE NATURE OF THE DEBTOR'S BUSINESS: ..................................3
C.  UNDERLYING ISSUES AND BACKGROUND OF THE EVENTS LEADING TO THE FILING FOR BANKRUPTCY: ..............................................4
D.    CRIMINAL PROCEEDINGS ...............................................................5
E.  CONTINUING EFFORTS TO BRING THE PROJECT INTO COMPLIANCE ...........6
F.  THE CIVIL LITIGATION ......................................................................6
G.  STATUS OF THE PROPERTY: .............................................................8
H.  GOALS OF THE DEBTOR ....................................................................9

**III.  THE BANKRUPTCY PETITION WAS NOT FILED IN BAD FAITH** ...................10

A.  THE TIMING OF THE PETITION .....................................................10
B.  THE BANKRUPCY PRESERVES THE RIGHTS OF THE DEBTOR AND CREDITORS ........................................................................................10
C.  THE MOVANTS AND CIVIL COURT BOTH CONFUSE AND COMBINE SLOPE REMEDIATION WITH DEMOLITION OF THE HOME ....................10
D.  THE BACKGROUND FACTS ALLEGED BY MOVANTS, WHILE DISPUTED, ARE BASED UPON INADMISSIBLE HEARSAY AND LACK FOUNDATION .....................11
    *1. There Is No Evidence That Mohamed Hadid Actually Bribed Any City Officials* .............12
    *2. The Property Is Not Unsafe And Is Not A Danger, Even In An Earthquake* ...............12
    *3. The Plaintiffs Statement Of Facts As To The Construction Supervision Is Without Foundation* .............14
    *4. While It Is True That Mr. Hadid Pled Nolo Contendre To The Criminal Charges Of Violating The Building Code, That Nolo Plea Is Not A Finding That Can Be Used In The Civil Case* ........14

**IV.  THE COURT SHOULD ALLOW THE DEBTOR TIME TO EXPLORE ALL OUTSIDE POSSIBILITIES, IN CONJUNCTION WITH THE SECURED CREDITORS, AND NOT DISMISS THE CASE OR ALLOW THE RECEIVER TO TAKE POSSESSION AT THIS TIME** ..................................................15

**V.  CONCLUSION** ..........................................................................................16

**DECLARATION OF MOHAMED HADID** .............................................17

**DECLARATION OF CARL JOSEPHSON** .............................................27

**DECLARATION OF JUSTIN KUNKLE** .................................................31

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

**CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY**

# TABLE OF AUTHORITIES

## Cases

*In re Marsch*, 36 F.3d 825, 828 (9th Cir 1994) ........................................................................2

*In re: Schwartz*  854 F.2d 569 (9th Cir. 1992) ......................................................................12

*Taylor v. Sternberg*, 293 U.S. 470, 472, 55 S. Ct. 260, 262, 79 L. Ed. 599 (1935)................iii

## Statutes

*Federal Rules of Evidence* section 801(c) .............................................................................13

## Other Authorities

*Los Angeles Municipal Code* section 91.3307.1 ...................................................................10

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

**CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   THE CHAPTER 11 FILING WAS NOT FILED IN FAITH AND THE CASE SHOULD NOT BE DISMISSED

The Petition was filed before the receiver was formerly in place and before he took possession of the assets of the Debtor.  The court's instruction to the receiver was to demolish the property.  It is beyond cavil that creditors and the Debtor will not benefit from that.  That no party in interest including the receiver has any idea how that will be accomplished is shown by the setting of a follow up hearing to give the receiver further instructions how to raise the significant funds to do the demolishing.

The movants are the Plaintiffs in a hotly disputed civil case.  While they waited seven years after they first allegedly learned of improper actions by the Debtor to file suit, their only goal in the litigation is to cause the total demolition of the real property.  Nothing in the action by Debtor by filing its Petition merits the dismissal of the bankruptcy, its immediate conversion, or at this juncture, even relief from automatic stay if that relief would be to put the real property in the hands of a receiver.

These papers are not intended and cannot possibly address every assertion raised in a roughly 500-page filing being heard on shortened notice.  But, the most important points are that there is no exigency and no imminent public safety issue.  Indeed, even the City of Los Angeles confirmed this *again* just this past Friday, where in the criminal proceedings against Mohamed Hadid held on December 13, 2019, the City responded to the Judge, as reported by the LA Times: ***"During the hearing, [Judge] Badhan-Smith asked if there was any public safety issue to address on the property. City prosecutor Michelle McGinnis said she had conferred with the building department and there was not."*** (emphasis added).  See Exhibit "B" to the Declaration of Mohamed Hadid.[1]/

---

[1]/  As stated, *infra*, the City's Assistant Chief of the Building Department, and a separate consulting engineer hired by the Debtor provided evidence to the civil court that the property is not in any imminent risk of failure.  No contrary evidence was ever admitted in the civil court.  The Declarations of Carl Josephson and Justin Kunkle provided herewith provide this evidence herein.

- 1 -

1    The receiver will make no effort to "maximize" the asset for the benefit of creditors and

2  the Debtor as a group.  His sole charge is to demolish the property, then presumably return

3  possession to the Debtor.  The Debtor, as the fiduciary of the estate, will maximize the

4  property under the eye of the Bankruptcy Court and the office of the United States Trustee.

5  The creditors including of course First Credit Bank will have notice of any proposed use or

6  further borrowing and will be able to make their concerns known.

7    The Debtor chose to try to reorganize its financial affairs within the context of chapter

8  11.  If the Court believes it proper, the state court matter can proceed other than as to the

9  appointment of the receiver or enforcement of a judgment.  But, filing to protect the assets and

10  prevent the loss of control of the property was not in bad faith.

11    The examination of bad faith was reviewed in *In re Marsch*, 36 F.3d 825, 828

12  (9th Cir 1994):

13

14   "The bankruptcy court may dismiss a Chapter 11 case "for cause" pursuant to
15  11 U.S.C. § 1112(b). Although section 1112(b) does not explicitly require that
    cases be filed in "good faith," courts have overwhelmingly held that a lack of
15  good faith in filing a Chapter 11 petition establishes cause for dismissal. *See,*
    *e.g., In re Little Creek Dev. Co.,* 779 F.2d 1068, 1072 (5th
16  Cir.1986); *Stolrow's,* 84 B.R. at 170; *In re N.R. Guaranteed Retirement,*
    *Inc.,* 112 B.R. 263, 270 (Bankr.N.D.Ill.), *aff'd,* 119 B.R. 149 (N.D.Ill.1990).
17  "The existence of good faith depends on an amalgam of factors and not upon a
    specific fact." *In re Arnold,* 806 F.2d 937, 939 (9th Cir.1986). The test is
18  whether a debtor is attempting to unreasonably deter and harass creditors or
    attempting to effect a speedy, efficient reorganization on a feasible basis. *Id.*
19
    The term "good faith" is somewhat misleading. Though it suggests that the
20  debtor's subjective intent is determinative, this is not the case. Instead, the
    "good faith" filing requirement encompasses several, distinct equitable
21  limitations that courts have placed on Chapter 11 filings. *See N.R.*
    *Guaranteed,* 112 B.R. at 271–72. Courts have implied such limitations to deter
22  filings that seek to achieve objectives outside the legitimate scope of the
    bankruptcy laws. *See Furness v. Lilienfield,* 35 B.R. 1006, 1011 (D.Md.1983);
23  Lawrence Ponoroff & F. Stephen Knippenberg, *The Implied Good Faith Filing*
    *Requirement: Sentinel of an Evolving Bankruptcy Policy,* 85 Nw.U.L.Rev. 919,
24  946–47 (1991). Pursuant to 11 U.S.C. § 1112(b), courts have dismissed cases
    filed for a variety of tactical reasons unrelated to reorganization. While the case
25  law refers to these dismissals as dismissals for "bad faith" filing, it is probably
    more accurate in light of the precise language of section 1112(b) to call them
26  dismissals "for cause." *In re Marsch,* 36 F.3d 825, 828 (9th Cir. 1994)

27    The Debtor's goal is to use the property for the benefit of everyone and not just

28  the neighbors.    Debtor does not oppose relief from stay to allow the state court action

ABDULAZIZ, GROSSBART & RUDMAN
Law Offices Of
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

to proceed *other than as to the actual possession and treatment of the property and, of course, any financing of further work including demolition, or enforcement of a judgment.*  The filing, to avoid the destruction of the Debtor's sole asset, which would be detrimental to the Debtor and all of the creditors, is a good faith use of the Bankruptcy Code. The Debtor has an intended plan of action and the means to carry it forward, but not if the real property is demolished.

## II.  BACKGROUND RELEVANT TO THE COURT'S DETERMINATION

### A.  THE DEBTOR:

The Debtor is a California Limited Liability Company, of which its managing member is Mohamed Hadid.  The entity was formed in California on May 14, 2012.  Mr. Hadid is the sole member, one hundred percent owner, and is the manager.   Mr. Hadid's has been developing real property in United States for roughly 40 years.   While he previously had developed substantial office space and a number of hotels throughout the Country, he is primarily known as the developer of large, single-family residences.  These are residences that comprise as much as 48,000 square feet, and sell for upwards of more than $50,000,000.  The property that is owned by 901 Strada, LLC was intended to be such a luxury property, on a premier location, approximately 21,000 square feet with views to the ocean.

### B.  THE NATURE OF THE DEBTOR'S BUSINESS:

The Debtor is a single-asset entity, formed for the purpose of holding, developing and ultimately selling the real property located at 901 Strada Vecchia Road, Bel Air, California. This is a picturesque property at the end of one of the most renowned streets in Bel Air.  The home, perched on a hillside, would have and has views to the ocean.

The Debtor currently has no employees; persons in the employ of Mr. Hadid through his other entities perform ministerial tasks such as accounting.  The debtor engages other independent entities to perform work on the property.

/ / /

/ / /

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

### C.  UNDERLYING ISSUES AND BACKGROUND OF THE EVENTS LEADING TO THE FILING FOR BANKRUPTCY:

Mr. Hadid personally purchased the property in about 2011.  It was transferred to a couple of companies that were then in existence, but before the property was ever developed it was transferred to an entity known as Syntra WVA, which was a Virginia limited liability company.  However, in 2012, the property was transferred to the Debtor and it has remained in the possession of the Debtor since.  The Debtor obtained permits and commenced construction of a residence that would span approximately 21,000 feet on three levels, including the basement area.

Mr. Hadid self-funded the purchase of the land as well as much of the initial construction.  Indeed, he personally has more than $20,000,000 invested in the project.  In 2014, First Credit Bank provided a construction loan which repaid some smaller loans taken out for the construction.  Subsequently, other lenders also provided financing.

The controversial part of the structure is that the plans which were permitted included two structures, a residence structure and a pool deck structure.  Each were intended to be fully complaint with the codes then in effect.  The separate pool deck structure, which also spanned approximately 36 feet in height, was intended solely to house a swimming pool and pool deck.  The building code would not allow this pool deck structure to physically be connected to the residence structure.  However, without such a connection, there would be no way to access the pool deck structure as both were elevated substantially from the Earth on a hillside.  The Debtor believed that the plans showed a physical connection and a concrete deck was poured that connected the two.  This was alleged to be a violation of the building code and the connection rendered the total height of the property as a <u>combined</u> 72 feet instead of two separate 36-foot structures.

In addition, the construction manager hired by the Debtor, Russell Linch of RAL Builders, Inc, a now defunct entity, whose contractor's license has been revoked, installed a deck below the pool deck, and began to add the infrastructure for  an IMAX theater in an area which was a void below the residence.  He did so, telling Mr. Hadid that the plans could be

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

- 4 -

later submitted to the City, for full approval.  That approval was never actually sought and the theater has now been filled with dirt.  As to the pool deck, Mr. Linch caused designs to be drawn to potentially add suites below the pool deck, through no such suites were ever actually constructed.  No electrical, plumbing or air conditioning was ever added to this area for suites. But, the movants consistently claim that six suites were actually constructed which is not true. The Debtor would only have done so if they had been permitted which they never were.  Mr. Linch also deviated in other respects from the plans, but no deviations were as substantial as the connection of the pool deck and its deck below, or the IMAX theater.

The construction progressed to the point that the entire concrete pool deck structure with a pool that was plumbed and gunited (concrete sprayed to form the shell of the pool), and a three story residence which was approximately 85% complete, were constructed on the property.

In about 2014, it is alleged by the Debtor that a neighbor below the subject property, Joseph Horacek, sought a payment which the Debtor has characterized in civil litigation as an extortion payment (which is the subject of a cross-complaint in the *__Bedrosian__* matter discussed below), whereby Mr. Horacek made it clear he wanted $3,500,000, or he was going to complain to the City about various aspects of the property.  Mr. Horacek called it an "inconvenience" payment.   The debtor refused to pay the $3,500,000 that Mr. Horacek sought, and as a result, Mr. Horacek, a former senior partner of Manatt, then proceeded to use his personal muscle as well as that of his firm, to complain on an almost daily basis to the Building Department, city officials, and anyone who would listen.

Ultimately, the Building Department issued notices to comply regarding various aspects of the property it deemed to be contrary to the building code.  The City of Los Angeles then revoked the building permits until new plans could be submitted which complied with the building code.  Appeals of those revocations were denied.

## D.    CRIMINAL PROCEEDINGS

Mr. Hadid was personally also charged by the City Attorney of the City of Los Angeles with misdemeanor violations of the building code.  The Debtor as well as its former manager,

James Zelloe, a Virginia lawyer who was only on the property approximately four times during its construction and resides in Virginia, were also charged, but those charges were dismissed with the only person only being convicted by means of a *nolo contendere* plea, was Mr. Hadid.  Mr. Hadid was sentenced to perform community service, paid a fine, and was put on probation for three years.  As a term of probation he was ordered to bring the property into compliance with the building code.

### E.    CONTINUING EFFORTS TO BRING THE PROJECT INTO COMPLIANCE

After the building permits for the property were revoked, the Debtor hired an entirely new design team to bring the property into compliance with the building code, and to cause new permits to be issued.  Complicating the process was the effect of revocation of the original permits.  The implementation of new building restrictions including a hillside ordinance would ultimately render the residence structure, which was never the subject of substantial controversy (other than the theatre and some minor modification), too tall; the pool deck structure, while still allowed under the Code, would have to be cut back substantially, due to set back requirements.  The Debtor has diligently sought to have the project brought into compliance for four years, but every time it got close to approval, the goal posts were moved, making it that much more implausible.

But, unlike the portrayal by the movants, the City has not allowed any actual work to take place at the property to further its construction, BUT, it has required extensive slope stabilization and erosion control measures required by the Municipal Code.[2]/  The Debtor continues to maintain the erosion control measures today.

### F. THE CIVIL LITIGATION

In 2018, after waiting seven years from when the neighboring property owners claimed they first learned of problems with the home and issues with its construction, four

---

[2]/    *Los Angeles Municipal Code* section 91.3307.1 provides: "Adjoining public and private property shall be protected from damage during construction, remodeling and demolition work.  Protection must be provided for footings, foundations, party walls, chimneys, skylights and roofs.  Provisions shall be made to control water runoff and erosion during construction or demolition activities."

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

homeowners, Joseph and Beatriz Horacek and John and Judith Bedrosian filed a lawsuit in the

Los Angeles Superior Court on June 7, 2018, in a case captioned _Bedrosian v. Hadid_, Case

Number SC129388.  In that action, it is alleged that the home was built contrary to the

building code and they raise a number of allegations are alleged against 901 Strada, LLC, Mr.

Hadid personally, James Zelloe, and the City of Los Angeles.  That case is pending and a trial

date had been set for March 2020.  In the action, the Debtor believes the only cause of action

which is not barred by the statute of limitations would be continuing nuisance. The Plaintiffs

claim millions of dollars in damages; the Debtor and Mr. Hadid have filed a cross-complaint

for attempted extortion and trespass.

As part of the proceedings, the Plaintiffs sought to have portions of the home

demolished that were outside of the building envelope.  A similar order was sought by the

Criminal Court.  Mr. Hadid entered into a voluntary agreement with the Criminal Court which

was then adopted with further refinements by the Civil Court, and a demolition plan dated

March 7, 2019 was imposed which required the pool deck structure to be demolished, the third

floor of the residence to be demolished, while allowing for continued waterproofing of the

premises as well as protection of the slope in what are known as erosion control measures

which remain in place today.  That work was completed at a substantial cost to the debtor.

A separate action has also been filed against Mr. Hadid, several of his other entities,

and 901 Strada in a case entitled _RAL Design and Management, Inc. v. Hadid_, which is

assigned Case Number 19SMCV01033.  The plaintiff in that case, Russell Linch, who had

continuously claimed the work was proper and had provided documents to that effect to the

Debtor, to Mr. Hadid, to the criminal court, and to the City, now has created an entirely new

narrative while falsely alleging that Mr. Hadids' entities owe his company millions of dollars

(an impossibility), including roughly $380,000 for his prior services performed for the Debtor.

In that case, 901 Strada has filed a Cross-Complaint in that action seeking between

$30,000,000 to $40,000,000 for the various damages caused to the property by Mr. Linch, who

has admitted to not following the plans and deviating from the building code in constructing

the premises.

ABDULAZIZ, GROSSBART & RUDMAN
Law Offices Of
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

### G.  STATUS OF THE PROPERTY:

As stated, worked stopped in 2014 and the building permits were permanently revoked in 2015.  The property has been in disrepair since.  It has suffered some water-intrusion but its lower levels are intact.  The recent claims of removal of materials from the property were the moving of materials which were damaged by flooding from the last rains.  This was the first heavy rain without the former third-floor and roof in place, and the contents were damaged. The Debtor did as he was required to secure the premises and protect its assets.

Recently, despite the Debtor's efforts to try to bring the property into compliance and have permitted sets of plans approved, the City of Los Angeles has come to the conclusion that it should be demolished.  The Debtor believes that the foundation can be retrofit.  It has prepared engineered plans to retrofit the foundation so that the home does not need to be torn down.  The Plaintiffs in the *Bedrosian* matter sought, and the Court tentatively entered an order, granting, the appointment of a receiver to oversee demolition of the property.  The testimony before the Court was that the property was not *in any imminent risk* of collapse or failure, that there was no immediate risk of harm to the neighbors, and there was no reason to immediately tear down the property.  The Court conducted a site walk and saw the view from the neighbors' home and without any expert testimony or support for the position, felt that the slope was steep and if the house fell down it would destroy the Plaintiffs homes below the property.

However, as stated, both an acknowledged expert, Carl Josephson, hired by the Debtor, and Shahen Akelyan, who is the Assistant Chief of the Los Angeles Department of Building and Safety Plan Check Department, testified under oath to the Civil Court Judge that there was no immediate risk of harm and that the property is not going to collapse.  Importantly, even the proposed receiver indicated that he would not be in a position to do any demolition, assuming funds were even available to do the demolition, for six months.  Given that would push the timing to months after the matter is scheduled for trial in the state court, there was no reason for the appointment.

/ / /

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

The Court nevertheless issued an order to appoint a Receiver but before the conditions to the appointment were met, and before the formal order was signed, the bankruptcy was filed.

## H.  GOALS OF THE DEBTOR

The property, as situated, has a partially built structure.  Including the amounts in arrears, there is approximately $31,000,000 in secured indebtedness against the real property.  There are also unsecured claims that are roughly $700,000, excluding the insider loans by entities related to Mr. Hadid which total more than $8,000.000.  Mr. Hadid and his entities have loaned or invested more than $20,000,000 of their own money into the construction of the property.  Indeed, between the acquisition of the property, construction costs of roughly $30,000,000 to date, and having to carry the property for the last eight years, there is more than $60,000,000 invested in this property.  The Debtor estimates that it would cost $15,000,000 to complete the construction of the home and sell it.  If sold, the Debtor believes that it could realize enough money to pay off the secured creditors, the unsecured creditors, and potentially even cause some return back to the Debtor.

On the other hand, the cost to tear down the house are estimated to be at least $5,000,000.  That does not include the cost to re-grade the hillside.  The property in its current state is virtually worthless to anyone.  Even if $5,000,000 is spent to remove the structure, the land will then only have a value of approximately $7,000,000 to $8,000,000, and of course there is the stigma attached to the land by the fact that the neighbors will most certainly contest any other development.

The Debtor's goal is to require the City of Los Angeles to perform its ministerial function and process the plans it has provided, of course providing any corrections that the City contends do not comply with the building code.  Instead of concerning itself with the feasibility and cost to retrofit the foundation, the City should perform its duties; the Debtor is hoping the Court will intercede in that effort.  The alternative of course is the loss of the Debtor's property, the loss to all the secured and unsecured creditors, and the substantial waste of resources.

1    **The key difference between demolition and continuing construction is that the**

2    **Debtor can borrow the necessary funds of about $15,000,000 to continue and complete**

3    **construction, as then there will be a _viable asset_ to sell.  There are no funds available to**

4    **spend $5,000,000 to demolish the structure, to then have the vacant land be worth just**

5    **$7,000,000 or so.**

6

7    **III.  THE BANKRUPTCY PETITION WAS NOT FILED IN BAD FAITH**

8    **A.  THE TIMING OF THE PETITION**

9    The Petition was filed before the Receiver was formerly in place and before he took

10    possession of the assets of the Debtor.  That is a proper use of the _**Bankruptcy Code**_.

11    **B.  THE BANKRUPCY PRESERVES THE RIGHTS OF THE DEBTOR AND**

12    **CREDITORS**

13    As stated above, there was no exigent circumstance for the court to order a receiver to

14    demolish the property. The Receiver and the civil court both required pre-demolition planning

15    which the Receiver stated would take months to perform.  Movant's Exhibit 2 (Transcript of

16    the November 20, 2019 civil court proceedings), pg. 36, l 21 - pg 37, l 5.  Moreover, under the

17    _Los Angeles Municipal Code_ section 91.3307.1 erosion control requirements, the City

18    previously took the position that the demolition of the pool deck structure could not take place

19    when it would interfere with the erosion control requirements.  Those requirements are strictly

20    enforced between October 16 and April 15 of each year.  There was no reason to rush to

21    appoint the receiver and no demolition can take place for months- giving time for the Debtor

22    to prove the property need not be demolished, or to appeal the court's ruling.

23    **C.  THE MOVANTS AND CIVIL COURT BOTH CONFUSE AND COMBINE**

24    **SLOPE REMEDIATION WITH DEMOLITION OF THE HOME**

25    The current Receiver's charge was to do what the City suggested it wanted – demolish

26    the property to the first floor slab.  The Debtor believes the City wants less than complete

27    demolition as complete demolition requires a permit – something the Debtor also wants.  If the

28    residence structure is demolished to the first floor slab, that does nothing to resolve any slope

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

- 10 -

issues.  Also, the evidence before the trial court was that soil work would be needed for access to demolish the structure, and the City will not issue permits for soil work.  This is a mostly concrete house, with hundreds of thousands of tons of concrete, which cannot be demolished with hand tools!

Focusing on the slope, admittedly, it is a steep hillside.   The hillside is currently covered by tarps as part of a erosion control program required by section 91.3307.1, which in the case of the Debtor's property, requires the implementation of tarps, pumps, and other systems to remove rain water from the property and prevent it from flowing down the hill to the adjacent properties.  The Debtor has maintained this system and will continue to maintain this system, even if the bankruptcy remains in effect.

The structure itself is somewhat demolished in that the third floor of the house was removed.  Tarps covering what remains of the house are in place, though those tarps are not foolproof, and as stated, rainwater has gotten into the home.  But again, demolition of structure and correction of the hillside are two different issues.   The City made it clear when the demolition Order of March 7, 2019, was issued that no work could be done which would interfere with the erosion control measures between October 15, 2019, and April 15, 2020.  To be clear, when the demolition Order was issued in March of 2019, work that would interfere with the slope protection measures could not commence until after April 15, 2019, and the work had to be done by October 15, 2019.

Thus, in this present case, no demolition of the house, which would interfere with the slope could also be done, until at least April 15, 2020.

**D.   THE BACKGROUND FACTS ALLEGED BY MOVANTS, WHILE DISPUTED, ARE BASED UPON INADMISSIBLE HEARSAY AND LACK FOUNDATION**

The majority of the contentions of the movants are based upon a single declaration of Russell Linch from May 2019, which is inconsistent with his own prior deposition testimony, and which has substantial bias.   It should not be considered under *F.R.E*, 801(c). Nevertheless, responses are provided so the Court does not believe these contentions are not

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

disputed by the Debtor.

Up until about May 2019, Russell Lynch had testified that knew of no problems with the foundation work he supervised, and that he was the construction manager performing and overseeing the work.    Mr. Linch was the sole person dealing with all of the building inspectors.  Mr. Linch wrote testimonial letters to the criminal court and testified favorably to the Debtor and Mr. Hadid at his deposition.  However, a dispute then arose between he and Mr. Hadid over money.

**1.  There Is No Evidence That Mohamed Hadid Actually Bribed Any City Officials**

Mr.. Linch contends he was asked to provide cabinets to a city inspector, Anthony Anderson. **3/**  Indeed, the moving parties, as Plaintiffs in the civil case, have made much hay regarding the alleged FBI investigation and the investigation of Mr. Anderson.  However, during the deposition of the City personnel investigating the claims, the City Investigator indicated that he had spoken to the person who had received the thing of value, the person who gave the thing a value, and an employee of the person who gave the thing of value.  None of the people that he spoke to were Mr. Hadid or James Zelloe, the former manager of 901 Strada LLC.  As to the FBI investigation, assuming there is still a valid or current FBI investigation, no one from the FBI has ever interviewed or asked to interview Mr. Hadid and based upon the lack of credibility of Mr. Linch, no-one would believe his testimony under oath.

**2.  The Property Is Not Unsafe And Is Not A Danger, Even In An Earthquake**

Without any authority whatsoever, the moving papers suggest that the property is unsafe, and if there is an earthquake, serious property damage or loss of life could occur. Judge Karlan convened an impromptu hearing in which he accepted the testimony of certain persons, including Carl Josephson, a consulting structural engineer hired by the Debtor, the City of Los Angeles Deputy Chief, Shahen Akeleyn, among others.  Both Mr. Josephson and Mr. Akeleyn testified that there was no imminent risk of failure.  Mr. Josephson went on to say

---

**3/**    It should be noted that in violation of the Bankruptcy Court's Stay, the deposition of Anthony Anderson occurred on December 11, 2019.  The Debtor did not attend that deposition, assuming that the Plaintiffs would honor the automatic Stay.  The deposition is void pursuant to *In re: Schwartz*  854 F.2d 569 (9th Cir. 1992).

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

that even in an 8.0 earthquake, the house would not fall down the hill but it might suffer some internal damage.  The Declaration of Justin Kunkle, which is provided herewith demonstrates that the house has not moved in any significant amount since it was built.  In fact, his Declaration demonstrates that every floor in the home is level, that there are no substantial cracks, there is no separation, and there is no signs of any settling or collapse, which would be evident if the property was really failing as suggested.

The Plaintiffs also mislead the court is with respect to demolition that was Ordered and performed.  Hadid and 901 Strada complied with the March 7, 2019, order to the greatest extent it could be complied with.  Judge Karlan found at an Evidentiary Hearing when the Plaintiffs sought a Contempt Order that the minor elements that were left in place had to be left in place for purposes of protecting the slope.  As to the building code issues with the foundation, the testimony of Mr. Akeleyn at the court hearing was that the rebar deficiency was similar to "going 66 in a 65 zone."  It was indicated that the property, as far as the piles are concerned, is 99% compliant.  However, the City requires 100% compliance.

This does not pose a danger or risk to anyone.  Despite what Mr. Linch has opined (Mr. Linch is not an engineer and he is a revoked contractor), the Code allows for the concrete piles to be embedded into the bedrock either twenty (20) feet deep with the piles being 36 inches wide, or thirty (30) feet deep into the bedrock, with the piles being 30 inches wide.  Here, the piles are twenty (20) feet into the bedrock and there is no argument there, but although the piles were made 36 inches wide, they only have the rebar of a 30 inch wide pile.  Therefore, they are off by 1%.  It is not that they are not drilled deep enough.  They just do not fully comply with the code.

As to the alleged hearsay statement by a person named Brian Wickersham (again inadmissible per *Federal Rules of Evidence* section 801(c)), he was not a project architect, but rather was a consultant for about two weeks trying to get the project back on track.  It is unknown who he was talking to, but his hearsay statement certainly is not proof of anything, nor is there any basis to know the foundation of his commentary.

/ / /

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

**3.    The Plaintiffs Statement Of Facts As To The Construction Supervision Is Without Foundation**

Although the Plaintiffs paint 901 Strada and Mr. Hadid as the persons who did the construction, all of the construction of the property through 2014 was performed and supervised by Russell Lynch, a licensed contractor and the owner of RAL Builders.  Mr. Lynch had full charge of all means and methods of construction.  Mr. Hadid would ask Mr. Lynch if something could be implemented and Mr. Lynch would be required to follow the building code in causing the permits to be amended and then implement the change.  At no time did Mr. Hadid physically direct any work and there is no evidence to show that he did (other than Mr. Linch).  The depositions building inspectors inspecting the grading and foundation,  Brian Olsen and Jeff Napier, were that they solely dealt with Russell Linch.  And Russell Linch and RAL Builders exclusively were in charge of the foundation construction.

Further, with respect to the Orders to Comply that he had been issued, the earlier prior grading Orders to Comply had been complied with to the satisfaction of the City.  Certainly, the City would not have let the property go on for three years with the previous Orders to Comply having not been complied with.  And with respect to the claims that the illegal grading has caused multiple mudslides, the true facts are that there have been three mud events, the last one occurring in 2014.

**4.    While It Is True That Mr. Hadid Pled *Nolo Contendre* To The Criminal Charges Of Violating The Building Code, That Nolo Plea Is Not A Finding That Can Be Used In The Civil Case**

The debtor was not convicted and it did not enter any plea as it was dismissed from the criminal case, as was Mr. Zelloe, it's former manager.  Mr. Hadid's plea is not an admission under the F.R.E.

/ / /

/ / /

/ / /

/ / /

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

**CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY**

## IV.  THE COURT SHOULD ALLOW THE DEBTOR TIME TO EXPLORE ALL OUTSIDE POSSIBILITIES, IN CONJUNCTION WITH THE SECURED CREDITORS, AND NOT DISMISS THE CASE OR ALLOW THE RECEIVER TO TAKE POSSESSION AT THIS TIME

As stated above, there is no immediate danger and even the receiver will not be acting immediately.  A pause will allow time to formulate a game plan.  The secured creditor does not want to lose its security.  The Debtor does not want to lose any ability to pay its creditors or lose any ability to recoup investments into the property.  Time is everyone's friend in this matter.

During a pause, the Debtor can arrange financing; the Debtor can continue its appeal and applications to the City, who must perform its statutory duty and review the plans the Debtor seeks to have submitted, instead of refusing to process plans.

The evidence before this trial Court was not that the property is unsafe.  The accompany declarations of Carl Josephson and Justin Kunkle, persons with actual knowledge of the property, and whose positions were made clear to the trial court, show the property does not present an imminent risk of failure.

Admittedly, there are violations of the building code.  That does not render the property unsafe.  The order of Judge Karlan confuses demolition of the structure with slope remediation.  Even if the property were to be demolished, that does not resolve a problem with the hillside and the hillside cannot be touched in accordance with the City ordinances, unless a building permit is issued, which requires a variance.  Thus, demolishing the property does nothing to cure the slope.

As shown by the moving papers' exhibits, the Receiver testified to the trial court that he would need about four to six (6) months to gather quotes, perform studies and to get up to speed and to hire persons to do the demolition.  That is assuming that the receiver is funded to do the work.  The Debtor does not have the money to fund the demolition at this time and thus the receiver would have to find the means to do this demolition on his own. This court should not allow additional financing that takes priority over the existing secured creditors.

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY

1      Thus, there is no exigency here and there is no benefit to dismissing the case or sending

2   the matter back to the receiver.  The highest and best use of the property would be to allow the

3   developer to continue to seek permits for the retrofit of the structure and its construction.  If

4   that cannot happen, then demolition may ultimately result but the bankruptcy was filed for a

5   good faith reason – and not in bad faith.

6

7                                **V.  CONCLUSION**

8      For the foregoing reasons, neither motion should be granted on shortened time.  At a

9   minimum, the Debtor should be given a few months to see if it can salvage the real property,

10  or come up with a plan to resolve these issues.  Allowing the State Court receiver is

11  tantamount to allowing the property and all of the rights of the creditors and the Debtor to be

12  forever lost.

13  DATED: ___12/16/19___                  ABDULAZIZ, GROSSBART & RUDMAN

14

15

16                                          _____
                                           By:    BRUCE D. RUDMAN
17                                          Attorneys for 901 STRADA, LLC

18

19

20

21

22

23

24

25

26

27

28

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

**CONSOLIDATED OPPOSITION TO MOTION TO DISMISS BANKRUPCY CASE, OR FOR RELIEF FROM AUTOMATIC STAY**

1

## DECLARATION OF MOHAMED HADID

2       COMES NOW MOHAMED HADID, WHO DECLARES AS FOLLOWS:

3       1.      I am a resident of Los Angeles County, over the age of 18, and am the managing

4   member of the Debtor, 901 Strada, LLC.

5       2.      I state the following with personal knowledge.  If asked to testify as to any of the

6   following, I could and would competently do so.

7       3.       The Debtor is a California Limited Liability Company, which was formed in

8   California on May 14, 2012.

9       4.      I am the sole member, one hundred percent owner, and I am its Manager.

10      5.      I have developing real property in United States for roughly 40 years.  While I

11  previously developed substantial office space (several million square feet) and a number of

12  hotels throughout the Country, I am primarily known as the developer of large, single-family

13  residences.  These are residences that comprise as much as 48,000 square feet, and sell for

14  upwards of more than $50,000,000.

15      6.      The real property that is owned by 901 Strada, LLC was intended to be such a

16  luxury property, on a premier location, approximately 21,000 square feet with views to the

17  ocean.

18      7.      The Debtor is a single-asset entity, formed for the purpose of holding,

19  developing and ultimately selling the real property located at 901 Strada Vecchia Road, Bel

20  Air, California.  This is a picturesque property at the end of one of the most renowned streets

21  in Bel Air.  The home, perched on a hillside, would have and has views to the ocean.

22      8.      The Debtor currently has no employees; persons in my employ through my other

23  entities perform ministerial tasks such as accounting.  I engage other independent entities to

24  perform work on the property.

25      9.      I personally purchased the property in about 2011.  It was transferred to a couple

26  of companies that were then in existence, but before the property was ever developed it was

27  transferred to an entity known as Syntra WVA, which was a Virginia limited liability

28  company.  However, in 2012, the property was transferred to the Debtor and it has remained in

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

the possession of the Debtor since.  The Debtor obtained permits and commenced construction of a residence that would span approximately 21,000 feet on three levels, including the basement area.

10.    I self-funded the purchase of the land as well as much of the initial construction. Indeed, I personally have more than $20,000,000 invested in the project, directly and through loans from my other entities to the Debtor.  In 2014, First Credit Bank provided a construction loan which repaid some smaller loans taken out for the construction.   Subsequently, other lenders also provided financing.

11.    The controversial part of the structure is that the plans which were permitted included two structures, a residence structure and a pool deck structure.  Each were intended to be fully complaint with the codes then in effect.  The separate pool deck structure, which also spanned approximately 36 feet in height, was intended solely to house a swimming pool and pool deck.  The building code would not allow this pool deck structure to physically be connected to the residence structure.  However, without such a connection, there would be no way to access the pool deck structure as both were elevated substantially from the Earth on a hillside.  I was informed and believed that the approved plans showed a physical connection and a concrete deck was poured that connected the two.  This was alleged to be a violation of the building code and the connection rendered the total height of the property as a <u>combined</u> 72 feet instead of two separate 36-foot structures.

12.    Until about April 2014, James Zelloe, a trusted Virginia-based lawyer who had represented me in a variety of matters for more than 30 years, served as Manager, and he held the membership interests in trust for me.  Those were transferred back to me in April 2014 and I then became manager.  The LLC hired a Russell Linch early in the construction to be the construction manager for the project.  At the time, he was doing business as RAL Builders, Inc. This entity had done some work on other projects I had built and I had believed him to be responsible, capable and trustworthy.   His entity is now out of business and I am informed its contractor's license has been revoked.

/ / /

13.    I personally did not direct the means and methods or control any aspect of the construction as far as how it was constructed.  My emphasis is on the design.  I approved a design and then asked the professionals to implement it.  In doing so, I believed that Russell Linch and the subcontractors he hired would perform in accordance with the building code.  Mr. Linch and a person he hired, which I believe was his uncle, installed all piles, caissons and concrete for the residence and the pool deck structure.

14.    I learned this past May that Russell Linch took liberties to make his job easier which are now alleged to have made the concrete piles installed as part of the foundation to not comply with the building code.  At no time would I have approved such actions, and they certainly saved no costs.  Other things he did, like relocating fireplaces, creating an IMAX theatre pursuant to plans we procured in a basement area below the driveway, and some other modifications from the plans, he assured me he had the consent of the inspectors and the City to make those modifications from the plans.  Otherwise, I would have instructed him to wait until the approval was in hand.

15.    Contrary to the assertions of the plaintiffs in the civil case, and the new assertions of Russell Linch, I had no involvement in any things of value that are alleged to have been given to a building inspector, Anthony Anderson.  I never even recall meeting this inspector or any other inspector during the construction, and I don't believe I did. I certainly did not pay or provide anything of value to anyone.

16.    As to the pool deck, Mr. Linch came to me and said we had the potential to add some suites below the pool deck.  I indicated that if the City would allow it, for him to ho ahead.  He caused designs to be drawn to potentially add suites below the pool deck, through no such suites were ever actually constructed.  No electrical, plumbing or air conditioning was ever added to this area for suites.  I would have only proceeded with the suite construction if approved.  But, Mr. Linch did say that he had approval to pour a slab floor in that areas, which I was told could be used for storage if not for any other purpose.

/ / /

/ / /

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

17.    Through early 2014, the construction progressed to the point that the entire concrete pool deck structure with a pool that was plumbed and gunited (concrete sprayed to form the shell of the pool), and a three story residence which was approximately 85% complete, were constructed on the property.

18.    In about 2014, a neighbor below the subject property, Joseph Horacek, initiated contact with me to solicit payments to avoid his interference with the project.  He first went to Mr. Linch, and told Mr. Linch he would pay him a fee if he caused me to pay him several million dollars.  Mr. Horacek then came directly to me and we had several meetings in which he indicated to me that unless I caused him to receive a payment of $3,500,000, he would complain to the City about various aspects of the property.   Mr. Horacek called it an "inconvenience" payment.   I refused to pay the $3,500,000 that Mr. Horacek sought, and as a result, Mr. Horacek, a former senior partner of Manatt, then proceeded to use his personal muscle as well as that of his firm, to complain on an almost daily basis to the Building Department, city officials, and anyone who would listen.   This attempted extortion is one cause of action of a cross-complaint pending in the State Court.

19.    Ultimately, the Building Department issued notices to comply regarding various aspects of the property it deemed to be contrary to the building code.  The City of Los Angeles then revoked the building permits until new plans could be submitted which complied with the building code.  Appeals of those revocations were denied.

20.    After the building permits were revoked, the City of Los Angeles brought criminal charges against the LLC and James Zelloe who was its manager at the time.  I was added later as a defendant.  Through a plea agreement, James Zelloe – who probably only visited the property four times (he resides in Virginia) and knew nothing about the physical construction – and the LLC were both dismissed, and I plead *nolo contendre*. I was sentenced to perform community service, paid a fine, and was put on probation for three years.  As a term of probation, I was ordered to bring the property into compliance with the building code. I have worked diligently to do so ever since.

/ / /

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

21.    On behalf of the Debtor, I hired an entirely new design team to bring the property into compliance with the building code, and to cause new permits to be issued. Complicating the process was the effect of revocation of the original permits.    The implementation of new building restrictions including a hillside ordinance would ultimately render the residence structure, which was never the subject of substantial controversy (other than the theatre and some minor modification), too tall; the pool deck structure, while still allowed under the Code, would have to be cut back substantially, due to set back requirements. The Debtor has diligently sought to have the project brought into compliance for four years, but every time it got close to approval, the goal posts were moved, making it that much more implausible.

22.    The City has not allowed any actual work to take place at the property to further its construction, BUT, it has required extensive slope stabilization and erosion control measures required by the Municipal Code.

23.    In 2018, after waiting seven years from when the neighboring property owners claimed they first learned of problems with the home and issues with its construction, four homeowners, Joseph and Beatriz Horacek and John and Judith Bedrosian filed a lawsuit in the Los Angeles Superior Court on June 7, 2018, in a case captioned _Bedrosian v. Hadid_, Case Number SC129388.

24.    As part of the proceedings, the Plaintiffs sought to have portions of the home demolished that were outside of the building envelope.  A similar order was sought by the Criminal Court.  I entered into a voluntary agreement with the Criminal Court which was then adopted with further refinements by the Civil Court, and a demolition plan dated March 7, 2019 was imposed which required the pool deck structure to be demolished, the third floor of the residence to be demolished, while allowing for continued waterproofing of the premises as well as protection of the slope in what are known as erosion control measures which remain in place today.  That work was completed at a substantial cost to the debtor.

25.    A separate court action has also been filed against me and several of my other entities (including 901 Strada) in a case entitled _RAL Design and Management, Inc. v. Hadid_,

- 21 -

which is assigned Case Number 19SMCV01033.  The plaintiff in that case is Russell Linch.

26.    Until he signed a declaration for the Plaintiffs in May 2019, and filed the foregoing lawsuit, Mr. Linch had continuously claimed the work was proper and had provided documents to that effect to me, to the LLC, to the criminal court (including letters about his interaction with Mr. Horacek), and even in his prior sworn deposition.

27.    At all times Mr. Linch and his company were independent contractors who I trusted to perform in accordance with the law.  He now claims that my companies owe his company millions of dollars (an impossibility), including roughly $380,000 for his prior services performed for the Debtor.  In that case, 901 Strada has filed a Cross-Complaint in that action seeking between $30,000,000 to $40,000,000 for the various damages caused to the property by Mr. Linch, who has admitted to not following the plans and deviating from the building code in constructing the premises.

28.    As stated, worked stopped in 2014 and the building permits were permanently revoked in 2015.  The property has been in disrepair since.  It has suffered some water-intrusion but its lower levels are intact.  The recent claims of removal of materials from the property were the moving of materials which were damaged by flooding from the last rains.  This was the first heavy rain without the former third-floor and roof in place, and the contents were damaged.  I have caused the Debtor to do what was required to secure the premises and protect its assets.

29.    Recently, despite our efforts to try to bring the property into compliance and have permitted sets of plans approved, the City of Los Angeles has come to the conclusion that it should be demolished.  Our design team and I believe that the foundation can be retrofit.  Our team has prepared engineered plans to retrofit the foundation so that the home does not need to be torn down.  The Plaintiffs in the *Bedrosian* matter sought, and the Court tentatively entered an order, granting, the appointment of a receiver to oversee demolition of the property.  The testimony before the Court was that the property was not *in any imminent risk* of collapse or failure, that there was no immediate risk of harm to the neighbors, and there was no reason to immediately tear down the property.  The Court conducted a site walk and saw the view

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

from the neighbors' home and without any expert testimony or support for the position, felt that the slope was steep and if the house fell down it would destroy the Plaintiffs' homes below the property.

30.    No person, other than the Plaintiffs in the civil case, without any expert support, claim the structure is in imminent danger of falling down the hillside as they claim.   In fact, the City does not contend this.   My engineers do not contend this.   At a hearing held in criminal court pertaining to my probation compliance, the criminal court judge specifically asked if the City had concerns over safety.   On Friday, December 13, 2019, in the criminal proceedings, the City responded to the Judge, as reported by the LA Times: ***"During the hearing, [Judge] Badhan-Smith asked if there was any public safety issue to address on the property. City prosecutor Michelle McGinnis said she had conferred with the building department and there was not."*** (emphasis added).   Attached hereto and incorporated herein as Exhibit "B" is a full copy of this article.

31.    The property, as situated, has a partially built structure.   Including the amounts in arrears, there is approximately $31,000,000 in secured indebtedness against the real property.   There are also unsecured claims that are roughly $700,000, excluding the insider loans by entities I control which total more than $8,000.000.   Between direct investment and loans from my other wholly owned entities, I have loaned or invested more than $20,000,000 of my own money into the construction of the property.   Indeed, between the acquisition of the property, construction costs of roughly $30,000,000 to date, and having to carry the property for the last eight years, there is more than $60,000,000 invested in this property.

32.    I have obtained estimates that it would cost $15,000,000 to complete the construction of the home and sell it.   If sold, the we believe that it could realize enough money to pay off the secured creditors, the unsecured creditors, and potentially even cause some return back to the Debtor.

33.    On the other hand, the cost to tear down the house are estimated to be at least $5,000,000.   That does not include the cost to re-grade the hillside.   The property in its current state is virtually worthless to anyone.   Even if $5,000,000 is spent to remove the structure, the

land will then only have a value of approximately $7,000,000 to $8,000,000, and of course there is the stigma attached to the land by the fact that the neighbors will most certainly contest any other development.

34.    Our goal is to require the City of Los Angeles to perform its ministerial function and process the plans it has provided, of course providing any corrections that the City contends do not comply with the building code.    Instead of concerning itself with the feasibility and cost to retrofit the foundation, the City should perform its duties; we are hoping the Court will intercede in that effort.  The alternative of course is the loss of the  property, the loss to all the secured and unsecured creditors, and the substantial waste of resources.

/ / /

35.    The key difference between demolition and continuing construction is that the Debtor can borrow the necessary funds of about $15,000,000 to continue and complete construction, as then there will be a *viable asset* to sell.  There are no funds available to spend $5,000,000 to demolish the structure, to then have the vacant land be worth just $7,000,000 or so.

36.    To refute the false allegations of the plaintiffs, moving parties herein, I emphatically deny that I provided, directly or indirectly, cabinets to a city inspector, Anthony Anderson.   The FBI has not interviewed me about this project or Mr. Anderson.

37.    I also dispute the allegations that the property is unsafe. I have hired a very well credentialed structural engineer, Carl Josephson,  to assure the safety of the property.   He opined in the civil court, as did the City of Los Angeles Deputy Chief, Shahen Akeleyn.  I was present in court when they testified to Judge Karlan.

38.    Both Mr. Josephson and Mr. Akeleyn testified that there was no imminent risk of failure.  Mr. Josephson went on to say that even in an 8.0 earthquake, the house would not fall down the hill but it might suffer some internal damage.

39.    I also caused my new contractor, Justin Kunkle, to do a survey of every floor of the property.   His declaration demonstrates that the house has not moved in any significant amount since it was built.  In fact, his Declaration demonstrates that every floor in the home is

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

1    level, that there are no substantial cracks, there is no separation, and there is no signs of any

2    settling or collapse, which would be evident if the property was really failing as suggested.

3        40.    The Plaintiffs also mislead the court is with respect to demolition that was

4    Ordered and performed.  I caused 901 Strada to hire Mr. Kunkle and demolition specialists,

5    and they complied with the March 7, 2019, order to the greatest extent it could be complied

6    with.  Judge Karlan found at an Evidentiary Hearing when the Plaintiffs sought a Contempt

7    Order that the minor elements that were left in place had to be left in place for purposes of

8    protecting the slope.  As to the building code issues with the foundation, the testimony of Mr.

9    Akeleyn at the court hearing was that the rebar deficiency was similar to "going 66 in a 65

10   zone."  It was indicated that the property, as far as the piles are concerned, is 99% compliant.

11   However, the City requires 100% compliance.  This does not pose a danger or risk to anyone.

12       41.    Despite what Mr. Linch has opined (Mr. Linch is not an engineer and he is a

13   revoked contractor), I am told that the Code allows for the concrete piles to be embedded into

14   the bedrock either twenty (20) feet deep with the piles being 36 inches wide, or thirty (30) feet

15   deep into the bedrock, with the piles being 30 inches wide.  Here, the piles are twenty (20) feet

16   into the bedrock and there is no argument there, but although the piles were made 36 inches

17   wide, they only have the rebar of a 30 inch wide pile.  Therefore, they are off by 1%.  It is not

18   that they are not drilled deep enough.  They just do not fully comply with the code.

19       42.    The Plaintiffs also cite to a statement by a person named Brian Wickersham.  His

20   firm was hired as a consultant for about two weeks trying to get the project back on track.  To

21   my knowledge they did no study of any of the construction documents and any comment he

22   may have made was without any actual knowledge of how the property was built.

23       43.    As stated above, I had no involvement in the means and methods of construction

24   of the property.  During its construction I never met with any of the City inspectors on the

25   project.  At the depositions of building inspectors inspecting the grading and foundation,

26   Brian Olsen and Jeff Napier, they claimed they solely dealt with Russell Linch.  And Russell

27   Linch and RAL Builders exclusively were in charge of the foundation construction.

28       44.    Lastly, with respect to the Orders to Comply that he had been issued, I was

- 25 -

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

1   assured and I believe that the earlier prior grading Orders to Comply had been complied with

2   to the satisfaction of the City. Certainly, the City would not have let the property go on for

3   three years with the previous Orders to Comply having not been complied with. And with

4   respect to the claims that the illegal grading has caused multiple mudslides, the true facts are

5   that there have been three mud events, the last one occurring in 2014. I was present at Mr.

6   Horacek's deposition where he conceded the last slope failure that caused any mud to go onto

7   Rocca Place was in December 2014.

8       45.    The Petition was filed so that the Debtor can arrange financing; can continue its

9   appeal and applications to the City, who must perform its statutory duty and review the plans

10  the Debtor seeks to have submitted, instead of refusing to process plans, and to protect the

11  creditors as well as the asset of the LLC.

12      I declare under penalty of perjury under the laws of the State of California and the

13  United States that the foregoing is true and correct. Executed at Los Angeles, California this

14  15th day of December, 2019.

15

16  _____

17  MOHAMED HADID, Declarant

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187

- 26 -

1    I, Carl Josephson, P.E., S.E., declare:

2    1.    I am the President of and a Principal Structural Engineer with Josephson Werdowatz &

3    Associates, Inc., a consulting firm that specializes in structural engineering services for the design of

4    commercial, institutional, industrial and residential construction projects. Josephson Werdowatz &

5    Associates also conducts structural investigations on various buildings and construction projects

6    throughout the United States and abroad. Such structural investigations are generally conducted for

7    homeowner associations, contractors, developers, building owners, insurance adjustors, and property

8    managers, among others.

9    2.    I have personal knowledge of the matters set forth herein and if called upon to testify I

10   could and would competently do so, except as to those matters stated on information and belief, and, as

11   to those matters, I believe them to be true.

12   3.    I have been a licensed professional engineer for 36 years and a licensed structural

13   engineer for 31 years. I hold professional engineering, civil, and/or structural engineering licenses in 21

14   different states. I hold a structural engineering license (SE 3034) in California which I received in 1988

15   and a civil engineering license (CE 36669) which I received in 1983.

16   4.    I am also a member of several professional organizations focused on civil and/or

17   structural engineering.  I am a past President and Fellow of the Structural Engineers Association of

18   California, past President of the Structural Engineers Association of San Diego, a Fellow in the

19   Structural Engineering Institute of the American Society of Civil Engineers, and a member of the

20   National Council of Structural Engineers Associations, among others. I am a past President of the San

21   Diego Chapter of the International Concrete Repair Institute and am a member of the Post-Tensioning

22   Institute. I was appointed by Governor Schwarzenegger and previously served as the Structural

23   Engineer member of the California Board for Professional Engineers, Land Surveyors, and Geologists.

24   I now serve as an Emeritus Member of the Board and as a consultant to the Board regarding

25   examination, enforcement, and evaluations. A copy of my curriculum vitae is attached as Exhibit A.

26   5.    The property under consideration is located at 901 Strada Vecchia Road in Los Angeles,

27   California.  The structure is located on a hillside in the hills of Bel Air.  The multi-story structure is

28

1

1   supported on concrete drilled piers and is constructed of cast-in-place concrete, structural steel, and

2   light-gauge steel framing.

3      6.  The concrete piles supporting the structure were originally specified to be 30 inches in

4   diameter and extend 30 feet into the bedrock. Later revised drawings called for the piers to be 36 inches

5   in diameter and extend 20 feet into bedrock, which is how the piers appear to have been constructed.

6   The minimum depth required by the soils report was 10 feet into bedrock.   The piles' as-built diameter

7   and embedment are adequate to support the existing structure.

8      7.  While the test reports and documents that we reviewed during our investigation indicate

9   that the steel reinforcement of the piles does not *strictly* comply with the code requirements for

10  minimum reinforcing, the amount of reinforcing is very close to the minimum required and is adequate

11  to support the existing structure.   Therefore, it is my opinion that the structure in its current condition

12  poses no imminent risk of harm to the neighbors.

13     8.  Based on our review of the special inspection reports, the post-construction test reports,

14  construction drawings, and structural calculations, we have reached the conclusion that the building as

15  it currently stands does not pose an imminent danger to life or property.  I understand that my opinion is

16  shared by City engineer Shahen Akelyan.

17     9.  Furthermore, based on our review of the proposed reconfiguration of the building

18  structure, along with our discussions with the architect and construction manager for the project, we

19  believe that the home can be reconstructed without the wholesale demolition of the building.

20

21     I declare under penalty of perjury that the foregoing is true and correct.

22  Executed at San Diego, CA.

23

24    Executed on <u>December 15, 2019</u>

25                 Carl Josephson, P.E., S.E.

26

27              12/15/2019

28



# EXHIBIT "A"

**Main Office**
6370 Lusk Boulevard, Suite F200
San Diego, California 92121-2753
Telephone 858.558.2181
Facsimile 858.558.2188
www.jwa-se.com



**JOSEPHSON
WERDOWATZ**
& ASSOCIATES, INCORPORATED
*Consulting Structural Engineers*

## Carl H. Josephson, P.E., S.E.

| **Summary of Qualifications** | Thirty-nine years of structural engineering experience |
| :--- | :--- |

Registered Professional Engineer:

| | |
| :--- | :--- |
| California: | Structural, No. 3034 (1988) |
| | Civil, No. 36669 (1983) |
| Arizona: | Structural, No. 24179 (1990) |
| Nevada: | Civil and Structural, No. 11240 (1995) |
| Utah: | Structural, No. 172215-2203 (1988/2008) |
| Idaho: | Civil and Structural, No. 8438 (1996) |
| Colorado: | Professional Engineer, No. 33979 (1999) |
| New Mexico: | Professional Engineer, No. 15634 (2002) |
| Washington: | Civil and Structural, No. 39150 (2002) |
| Florida: | Professional Engineer, No. 59742 (2003) |
| Indiana: | Professional Engineer, No. PE10606235 (2006) |
| Texas: | Professional Engineer, No. 111095 (2012) |
| Illinois: | Structural Engineer, No. 081.007694 (2015) |
| Michigan: | Professional Engineer, No. 6201066462 (2017) |
| Missouri: | Professional Engineer, No. 2018000452 (2018) |
| North Dakota: | Professional Engineer, No. PE-27217 (2018) |
| New York: | Professional Engineer, No. 099195 (2018) |
| Louisiana: | Civil and Structural, No. 42801 (2018) |
| Kansas: | Professional Engineer, No. PE26515 (2018) |
| West Virginia: | Professional Engineer, No. 23259 (2018) |
| Ohio: | Professional Engineer, No. PE83851 (2018) |
| Connecticut: | Professional Engineer, No. 33826 (2019) |

BSCE, 1980, San Diego State University
Also attended U.S. Air Force Academy, Colorado

| **Experience** | Josephson-Werdowatz & Associates, Inc., San Diego, CA |
| :--- | :--- |

President - Principal Structural Engineer

Klagge-Stevens & Associates, Inc., San Diego, CA - 3 years
Senior Associate - Director, Structural Engineering Division

Nowak-Meulmester & Associates, Inc., San Diego, CA. - 4 years
Associate - Project Manager

Hope Consulting Group, Inc., San Diego, CA. - 1 year
Project Engineer in the Structural Engineering Division

Carpenter for various commercial and residential contractors in
San Diego County, CA. - 4 years

**Las Vegas**
3753 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169-0952
702.733.6500

**Scottsdale**
14362 N. Frank Lloyd Wright Blvd., Ste. 1000
Scottsdale, Arizona 85260-8847
480.945.5337

**Sacramento**
770 L Street, Suite 950
Sacramento, California 95814-3361
916.242.8331



**Carl H. Josephson, P.E., S.E.**

| | |
|---|---|
| **Professional Affiliations** | Structural Engineers Association of California - Past President |

Structural Engineers Association of California - Past President
    Elected to the College of Fellows (2007)
    Professional Licensing & Certification - Chair
    Legislative Committee - Member and Past-Chair
    Convention Committee - Past Chair
Structural Engineers Association of San Diego - Past President
National Council of Examiners for Engineering and Surveying
    Emeritus Member
    Organizer/Moderator of Structural Engineering Licensing Caucus (2017-2019)
    Mobility Task Force (2013)
    Structural Examination Committee
    Participating Organizations Liaison Council
Structural Engineers Association of Arizona
National Council of Structural Engineers Associations
    Professional Licensing Committee
    2015 Robert C. Cornforth Award for Exemplary Service to Member Organization
        and the Profession
Certified in the Practice of Structural Engineering by the Structural Engineering
    Certification Board (SECB)
American Society of Civil Engineers - Life Member
Structural Engineering Institute - Charter Member
    SEI Fellow (2018)
    Professional Activities Committee - Professional Licensing - Chair
    Alternate Delegate to Structural Engineering Licensure Coalition
California Legislative Council of Professional Engineers (former member)- Past President
Earthquake Engineering Research Institute
U.S. Resiliency Council
    Certification Selection Committee
State of California:
    Board for Professional Engineers, Land Surveyors & Geologists
        Appointed to the Board in 2011 by Gov. Schwarzenegger
        Emeritus Member 2014
        Consultant to Board for Enforcement, Examinations, Evaluations
        Grader & Member of Standard  Setting Committee for Structural
            Engineering Examination
        Member of Structural Engineering Technical Advisory Committee
    Calif. Emergency Management Agency
        Post-Disaster Safety Assessment Program Trainer
        Building Safety Assessment Evaluator following the Northridge and San
            Simeon Earthquakes
International Concrete Repair Institute, San Diego Chapter - Past President
International Code Council
National Concrete Masonry Association
Post-Tensioning Institute

# <u>DECLARATION OF JUSTIN KUNKLE</u>

I, Justin Kunkle, declare and say that:

1.      I am a licensed general contractor and have been working at the construction project at 901 Strada Vecchia Rd. in Los Angeles since May 2018.  If called upon as a witness I could and would testify competently to the matters herein which are based upon my own personal knowledge.

2.      First and most important, the structure has not shown any signs of movement since I have been associated with it and I know of no instance of any signs of movement prior to my involvement.

3.      Second, the local building code requires that the current erosion control system must remain intact and fully functional until at least April 15, 2020.  Therefore, as a practical matter, no demolition can occur until the spring at the earliest.

4.      Third, I was ordered to bring to state court the geologist's field observation reports, deputy inspection reports, structural observations and LADBS inspection records which showed approvals for structural components of the structure's foundation.  I personally delivered these records to the Court and they were later submitted on a thumb drive.

5.      As to the first point, I have taken a level to every floor area in the structure and I understand that water level tests and other measures of level have been conducted over time.  In all instances, the structure has remained level.  See the photographs attached hereto as Exhibit C which I took on November 4, 2019.  If there had been any movement of the structure one would see areas out of level.

6.      Also, there is no evidence of cracking, seams, gaps or other indicia of movement.  I testified in the state court case that, in my professional opinion, the structure presents no imminent danger to the neighbors based upon my observations, third party tests and observations and the professional opinions of

Law Offices Of
ABDULAZIZ, GROSSBART & RUDMAN
6454 Coldwater Canyon Avenue
North Hollywood, CA 91606-1187
(818) 760-2000

of my peers.  Every consultant, engineer, architect, designer and subcontractor who has earnestly observed or performed work at the site has reached the same conclusion.  I was present in court when the city structural engineer, Shahen Akelyan, testified that the structure is not unsafe and presents no imminent danger to the neighbors or anyone else.

7.   As to the second point, a substantial amount of grading and shoring will be needed to stage demolition equipment before any demolition of the structure can occur.  Under current LADBS Rules and Regulations for the rainy season, this cannot occur until the spring.  Doing otherwise would destabilize the slope.  Therefore, in my opinion, it would be most prudent for the structure to remain intact through the rainy season.  Any shoring and grading activities occurring during the rainy season would present safety issues far greater than now exist in the slope's present condition.

8.   As to the third point, the difference between what was approved on the plans (30" piles imbedded into 30'of embedment) and what was built (36" piles with 20' of embedment) are more than sufficient to support the structure as presently constructed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Granada Hills, California this _16_ day of December 2019.

JUSTIN KUNKLE, Declarant

# EXHIBIT "B"

ADVERTISEMENT



CALIFORNIA

# A judge ordered the Hadid mansion in Bel-Air torn down. But now there's a legal logjam



The unfinished mansion on Strada Vecchia Road as seen in 2017. Parts of the Bel-Air home have since been torn down in an effort to bring the home in line with city codes. (Genaro Molina / Los Angeles Times)

By EMILY ALPERT REYES
STAFF WRITER

DEC. 13, 2019
3:31 PM

 

A hulking, unfinished mansion perched on a Bel-Air hillside must be torn down to the slab, a Los Angeles Superior Court judge said in a recent ruling, declaring it a "danger to the public."

But a bankruptcy filing has put that order on hold, alarming neighbors who pushed for the teardown of the mammoth building that has spurred criminal charges, legal battles with neighbors and an FBI investigation.

The huge home is the work of Mohamed Hadid, a real estate developer known for his lavish homes and stints on reality TV, who pleaded no contest 2½ years ago to criminal charges for building a home far bigger and taller than the city says it approved. Hadid said he would bring it in line with city codes and eventually tore down parts of the unfinished home.

Los Angeles city officials eventually joined neighbors in <u>calling</u> for the entire home to be demolished, citing serious concerns about parts of the foundation driven into bedrock under the home.

ADVERTISING 

In a recent order, Los Angeles Superior Court Judge Craig D. Karlan cited that and other problems, including massive amounts of soil scraped away from the hillside without permits. He chose a receiver to take control of the Bel-Air property and oversee the demolition, calling the site a "serious danger."

"There is a danger to this neighborhood. It's plain as one can see. And I don't know how anyone can view this differently," Karlan said at a hearing last month.

Karlan put that order on hold, however, after a company tied to Hadid filed for bankruptcy in late November. That company, 901 Strada LLC, owns the Bel-Air site at the center of the case.

At a civil court hearing earlier this month, Karlan said he couldn't rule on anything tied to the LLC unless the bankruptcy court gave him the green light. Attorneys representing the neighbors are prodding the bankruptcy court to allow the demolition order to move forward but have yet to win any such ruling.



**SPONSORED CONTENT**

**It's all about the kids**

By UNICEF USA

Just who is UNICEF helping, exactly? See their faces and learn the facts.

Neighbors had hoped to get around that roadblock in criminal court, where city prosecutors had asked a judge to stiffen the probation conditions for Hadid and require him to tear the building down to its foundation.

But at a hearing Friday, Judge Neetu S. Badhan-Smith declined to rule on that request, saying that she didn't want to do anything that might conflict with the order in civil court — even after

During the hearing, Badhan-Smith asked if there was any public safety issue to address on the property. City prosecutor Michelle McGinnis said she had conferred with the building department and there was not.

Attorney Shoshana E. Bannett, who is representing the Bel-Air neighbors, disputed that idea in a statement Friday, pointing back to the findings by Karlan that the building posed a danger to the public — a conclusion that was "reached after numerous hearings, personally visiting the site, and is based on extensive testimony from city witnesses and others."

It is unclear when the legal logjam over the property could be resolved. A hearing in bankruptcy court is scheduled for next week.

Hadid was not in criminal court Friday, where he was represented by attorneys Donald Re and Robert Shapiro at the hearing.

In the past, Hadid has denounced the civil suit as a "witch hunt" and sued back, accusing one of his neighbors of trying to extort him.

In a previous interview, Hadid said he had done nothing wrong but pleaded no contest to the criminal charges in order to "move on" and avoid embarrassing city inspectors who had signed off on the construction.

The FBI has also looked into possible wrongdoing by a city inspector who received "items of value" in connection with his work at the Bel-Air site, according to a city investigator who testified last year in the civil case. Hadid has denied claims by a former construction manager about perks for an inspector scrutinizing the site, including wooden cabinets and closets.

CALIFORNIA

NEWSLETTER

**Get our Essential California newsletter**

Please enter your email address

Subscribe



Emily Alpert Reyes

 Twitter    ⊙ Instagram    ✉ Email    f Facebook

Emily Alpert Reyes covers City Hall for the Los Angeles Times.

MORE FROM THE LOS ANGELES TIMES



CALIFORNIA

**Burbank middle school removes mural of Nobel Peace Prize winner Aung San Suu Kyi**

2 hours ago



CALIFORNIA

**Zócalo Public Square founder engaged in discriminatory and inappropriate conduct, investigation finds**

Dec. 15, 2019

# EXHIBIT "C"



































































